UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
————————————————————

UNITED STATES OF AMERICA,

        v.

PATRICK W. CARLINEO, Jr.

        Defendant.

————————————————————

**19-CR-6140-FPG**

**NOTICE OF MOTION FOR COMPASSIONATE RELEASE   PURSUANT TO 18 U.S.C. § 3582(c)(1)(A)**

| | |
|---|---|
| **MOTION BY:** | Sonya A. Zoghlin, Assistant Federal Public Defender, Attorney for Patrick W. Carlineo. |
| **DATE, TIME & PLACE:** | Before the Honorable Frank P. Geraci, Jr., United States District Court Chief Judge, United States Courthouse, 100 State St., Rochester, New York 14614, **on the papers**. |
| **SUPPORTING PAPERS:** | Memorandum of Assistant Federal Public Defender Sonya A. Zoghlin, dated December 28, 2020. |
| **RELIEF REQUESTED:** | Reduction of Term of Imprisonment Pursuant to 18 U.S.C. § 3582(c)(1)(A) and immediate release to home confinement. |

**DATED:**   Rochester, New York,
          December 28, 2020.

                    Respectfully submitted,

                    **/s/ Sonya A. Zoghlin**
                    Assistant Federal Public Defender
                    Federal Public Defender's Office
                    28 E. Main Street, Suite 400
                    Rochester, New York 14614
                    (585) 263-2601; FAX: 585-263-5871
                    sonya_zoghlin@fd.org

**TO:**   Brett Harvey
       Assistant United States Attorney

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA,

           v.

PATRICK W. CARLINEO, Jr.

           Defendant.

_____

**19-CR-6140-FPG**

**MOTION FOR
COMPASSIONATE
RELEASE PURSUANT TO
18 U.S.C. § 3582(c)(1)(A)**

## I.    <u>INTRODUCTION</u>

Patrick W. Carlineo respectfully moves this Court to grant his motion for compassionate release under 18 U.S.C. § 3582(c)(1)(A) based on the "extraordinary and compelling reasons" presented by the COVID-19 pandemic by issuing an order reducing his sentence to time served and ordering his immediate release to home confinement. Mr. Carlineo, whose prison term expires on March 5, 2020, is scheduled to be released to the Volunteers of America of Western New York Residential Re-Entry Center ("RRC") in Rochester on January 29, 2021.

This Court should grant relief because Mr. Carlineo suffers from obesity; asthma; sleep apnea; and atrial fibrillation. These underlying medical conditions significantly increase his susceptibility to complications, including death or lingering negative effects from contracting COVID-19 while housed in close quarters with other inmates at the Bureau of Prisons (BOP) and, after January 29, 2021, at a halfway house. He also suffers from depressive disorder and post-traumatic stress disorder, making the isolation of incarceration during the

pandemic particularly harsh and his successful adjustment to the residential re-entry center more difficult. Finally, his release to home confinement is also appropriate because it serves the goal of supporting his successful reintegration into the community; conserves valuable government resources; and alleviates the hardship on his family of his continuing absence. Simply put, it makes eminently more sense to release Mr. Carlineo to home confinement, where he can be busy and productive in the safety of his own home and resume mental health treatment with a familiar provider, than to require him to live in yet another potentially unhealthy, residential facility 100 miles from his home where he will be exposed to multiple other unrelated adults and they to him.

## II.   BACKGROUND

On November 18, 2019, Patrick Carlineo appeared before this Court and pleaded guilty to a two-count superseding information charging him with Threatening a United States Official, in violation of Title 18 U.S.C. § 115(a)(1)(B), and Felon in Possession of Firearms, in violation of 18 U.S.C. §922(g)(1). On March 6, 2020, this Court sentenced Mr. Carlineo to serve one year plus one day incarceration to be followed by a three-year term of supervised release. Mr. Carlineo surrendered as directed to begin serving his sentence at FCI Ashland in Ashland, Kentucky on May 27, 2020. Though his release date from federal custody is March 5, 2021, Mr. Carlineo is scheduled to be released to a halfway house in Rochester (the Volunteers of America of Western New York RRC) on January 29, 2021.

Patrick Carlineo suffers from asthma; sleep apnea; and atrial fibrillation, in

addition to other medical conditions.[1] Most significantly in the context of this application, his recent medical records also reveal that, as of June 11, 2020, Mr. Carlineo was 66 inches tall and weighed 220 pounds. *Id.* According to the Centers for Disease Control and Prevention (CDC), these figures correspond to a body mass index (BMI) of 35.5, well over the point at which one is considered to be obese.[2]

Following his arrival at FCI Ashland on May 27, 2020, Mr. Carlineo was tested for COVID-19 and determined to be negative. After the most recent spike in cases of COVID-19, however, Mr. Carlineo began experiencing symptoms including fever, chills, nausea, diarrhea, and the loss of his sense of taste and smell. A subsequent test taken on December 4, 2020 revealed that he was now positive for COVID-19. On December 7, 2020, he was seen by medical staff at Ashland. Clinic staff noted the following in his medical chart: "COVID-19 RNA: Positive." He was also noted to be "symptomatic" at that time. Mr. Carlineo's medical records indicate that his infection was considered "resolved" as of December 14, 2020. On that same date, however, medical staff described him as a "COVID positive inmate requesting Tylenol," which he was provided. Under "indication" the records state, "Confirmed case COVID-19." *Id.* Mr. Carlineo continues to experience fatigue and headaches as a result of his illness. As of December 14, 2020, his medical records do not reflect a subsequent *negative* test for COVID-19.

As addressed in more detail below, these medical conditions place Mr.

---

[1] *See* Exhibit A (Patrick Carlineo's medical records from FCI Ashland), to be filed under seal.

[2] https://www.cdc.gov/healthyweight/assessing/bmi/adult_bmi/english_bmi_calculator/bmi_calculator.html, last visited 12/27/20. Noting that a BMI of 30 or above is considered obese.

Carlineo at risk for serious complications, or even death, if he continues to suffer from or is re-infected with COVID-19. Obesity and asthma are among those underlying medical conditions that have been determined to place individuals at an increased risk for severe illness from COVID-19.[3] In addition to Mr. Carlineo's physical ailments, he has also been diagnosed with depressive disorder and post-traumatic stress disorder. *See* Defendant's Sentencing Statement, filed under seal on March 2, 2020, at pp. 10-12.

As a result of both his physical and mental health conditions, the Social Security Administration determined (in a decision rendered in 2008) that Mr. Carlineo should be considered legally disabled beginning December 31, 2002. The decision noted that in addition to "his multiple physical impairments," Mr. Carlineo had also been diagnosed with depressive disorder; post-traumatic stress disorder; and a panic disorder. *See* Exhibit N to Defendant's Sentencing Statement (Social Security Administration Office of Disability Adjudication and Review Decision, dated May 19, 2008). If released to a halfway house, therefore, the usual advantage of allowing residents to engage in outside employment would not apply to Mr. Carlineo, nor would it be practical for him to seek employment in Rochester.

Mr. Carlineo has spent his entire life in rural New York, living in or around the Southern Tier area. He currently lives with his fiancée in Rathbone, a town of just over 1,000 residents located approximately 100 miles south of Rochester in Steuben County. Their home is in a remote area surrounded by farms and open

---

[3] *See* CDC, People with Certain Medical Conditions, available at https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html, last visited on December 27, 2020.

fields. *See* Defendant's Sentencing Statement, filed under seal on March 2, 2020, at pp. 24-26. During the summer months, Mr. Carlineo plants a large garden and harvests vegetables through the fall, which supplements their food supply year round. He also chops and hauls wood for the winter. During the colder months, he maintains the wood-burning stove, which is the only source of heat in their home, by stoking it every 4-6 hours. His fiancé, Lisa, has been struggling to keep up with the chores by herself at home, particularly maintaining the heat, in addition to her full-time job in research and development at Corning. *See id.* at pp. 13-16.

To alleviate the crisis in our jails caused by COVID-19, the CARES Act permits the Director of the Bureau of Prisons to lengthen the maximum amount of time a prisoner spends in home confinement. CARES Act, §12003(b)(2). Former Attorney General William Barr directed the BOP to prioritize home confinement as an appropriate response to the COVID-19 pandemic initially on March 26, 2020.[4] In a subsequent memorandum he noted that "inmates with a suitable confinement plan will generally be appropriate candidates for home confinement" and directed that the BOP immediately process such inmates for transfer.[5] Indeed, the BOP has highlighted their efforts to comply with this directive on its website.[6]

Mr. Carlineo is an ideal candidate to be released to home confinement immediately or, at a minimum, when he is scheduled to be released from FCI Ashland to the Volunteers of America RRC in Rochester on January 29, 2021. When

---

[4] Memorandum from Attorney General to Director of Bureau of Prisons (March 26, 2020), https://www.bop.gov/coronavirus/faq.jsp, last visited December 29, 2020.

[5] Memorandum from Attorney General to Director of Bureau of Prisons (April 3, 2020) https://www.justice.gov/file/1266661/download, last visited December 29, 2020.

[6] COVID-19 and Home Confinement, https://www.bop.gov/coronavirus/faq.jsp, last visited December 29, 2020.

contacted recently by defense counsel, neither his case manager at FCI Ashland, nor his Residential Re-Entry Manager, were able to explain the basis for the decision for Mr. Carlineo to be released to an RRC rather than home confinement, and each suggested to counsel that the other individual and/or agency was responsible for making that decision.

Like other BOP facilities, FCI Ashland is experiencing a precipitous surge in COVID-19 case among inmates. As of December 28, 2020, at least 356 inmates have tested positive for COVID-19 (up from 341 on December 23, 2020), with 38 currently active cases (up from 32 on December 23rd).[7]  In addition, 45 staff members have tested positive for COVID-19 with 16 currently active cases. Tragically, 5 inmates have died in Ashland of COVID-19, one of whom died within the last two weeks.[8]  In Kentucky more generally, where FCI Ashland is located, as of December 28, 2020, there have been at least 258,820 cases of COVID-19 since the beginning of the pandemic and 2,845 COVD-19 related deaths.[9] COVID-19 cases diagnosed in Kentucky spiked over the last three months from a 7-day average of 770 new cases on October 1, 2020 to an average of 3,526 new cases on December 4, 2020, and most recently, to a 7-day average 2,005 new cases as of December 27, 2020.[10]

The rapid spread of COVID-19 within the BOP is not limited to its prisons. As of December 23, 2020, the Volunteers of America of Western New York RRC has had 9 residents test positive for COVID-19, only one of whom is considered to be

---

[7] https://www.bop.gov/coronavirus/, last visited December 28, 2020.

[8] *Id.* (The number of inmate deaths was 4 when this site was visited on December 17, 2020 and is currently 5.)

[9] https://www.nytimes.com/interactive/2020/us/kentucky-coronavirus-cases.html, last visited December 28, 2020.

[10] *Id.*

"recovered."[11]

On June 12, 2020, Patrick Carlineo submitted a request to the warden at FCI Ashland that he "be considered for the CARES Act." *See* Exhibit B. On June 16, 2020, he received the following response: "You are ineligible due to your current Violent [*sic*] offense where you threatened to kill a Congresswoman." *Id*. The response provides no further elaboration, nor does it explain under what guidelines Mr. Carlineo would be considered "ineligible." It is clear, however, that to the extent this response suggests he is *legally* ineligible for consideration under the CARES Act, as opposed to an internal BOP policy, it is plainly incorrect. *See infra*.

## III.   ARGUMENT

As amended by the First Step Act, Title 18, United States Code § 3582(c) provides, in relevant part, that:

[T]he court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that –

---

[11] https://www.bop.gov/coronavirus/, last visited December 28, 2020.

(i)     extraordinary and compelling reasons warrant such a reduction . . . and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission[.]

18 U.S.C. § 3582(c)(1)(A).

Accordingly, the statute sets forth a two-step inquiry that must be satisfied before the Court may reduce a previously-imposed term of imprisonment.  First, the Court must find that "extraordinary and compelling reasons" exist, which would warrant the reduction.  *Id.*  If the Court finds that "extraordinary and compelling reasons exist," the statute directs the Court to consider "the factors set forth in §3553(a) to the extent they are applicable," and to ensure "that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission[.]" 18 U.S.C. § 3582(c)(1)(A).

Under federal law, the Bureau of Prisons must ensure that a prisoner spend the final portion of his sentence, up to one year, in a community correctional facility, and "shall, to the extent practicable, place prisoners with lower risk levels and lower needs on home confinement for the maximum amount of time permitted under this paragraph," which is "the shorter of 10 percent of the term of imprisonment of that prisoner or 6 months." 18 U.S.C. § 3624(c)(1) and (2).[12]

On March 26, 2020, Attorney General William Barr issued a memorandum to the Director of the BOP, Michael Carvajal, directing him "to prioritize the use of your various statutory authorities to grant home confinement for inmates seeking

---

[12] Under the CARES Act, the Director of the Bureau is not limited to the shorter of 10 percent of the term or 6 months, but may extend the maximum time permitted under home confinement as the Director deems appropriate. Under either scenario, however, Mr. Carlineo is clearly eligible for immediate release.

transfer in connection with the ongoing COVID-19 pandemic." *Supra*, n. 4. The CARES Act (H.R.748), which was passed with unanimous bipartisan support and signed into law by the President on March 27, 2020, expressed Congress' view that, in response to the pressures of the pandemic, the federal prison population should be reduced by expanding BOP's authority to release inmates to home detention.

The Court has jurisdiction to consider and decide, on the merits, Mr. Carlineo's motion for compassionate release, pursuant to 18 U.S.C. § 3582(c)(1)(A). This statute gives the Court the power to "reduce the term of imprisonment" of a sentenced defendant, upon his direct motion, "after . . . the lapse of 30 days from the receipt of such a request [for administrative remedy] by the warden of the defendant's facility[.]" 18 U.S.C. § 3582(c)(1)(A). As noted above, Mr. Carlineo submitted a request for compassionate release on June 12, 2020 and the Warden denied his request on June 16, 2020.  *See* Exhibit B.

### A.   The outbreak of COVID-19 within the Bureau of Prisons, is a pandemic within the pandemic and FCI Ashland is no exception.

This Court has broad discretion to reduce a defendant's sentence under 18 U.S.C. § 3582(c).  "The only statutory limitation on what a court may consider to be extraordinary and compelling is that '[r]ehabilitation . . . alone shall not be considered an extraordinary and compelling reason.'" *United States v. Brooker*, 976 F.3d 228, 237-38 (2d Cir. 2020). Patrick Carlineo's obesity and other medical conditions place him at risk for more serious complications and even death from COVID-19.  The communal housing arrangement at Ashland FCI is a tinderbox for the spread of infection, as reflected in the surge in coronavirus cases among

inmates. The significant risk to Mr. Carlineo of suffering serious complications from contracting COVID-19 is an extraordinary and compelling circumstance warranting a reduction in his sentence.

On March 11, 2020, the World Health Organization (WHO) designated the COVID-19 outbreak a global pandemic.[13]  On March 13, 2020, the President of the United States declared a national state of emergency.[14]  As of December 28, 2020, more than 80 million people have been infected globally and over 1.7 million people have died.[15]  In the United States, more than 19.1 million people have been infected, and more than 333,000 people have died.[16]  To stem the spread of the disease, the CDC has broadly advised people to take basic preventive actions, such as avoiding crowds, staying six feet away from others, wearing face masks, keeping surfaces disinfected, and frequently washing their hands or using hand sanitizer.[17] The seriousness of the crisis need not be belabored here as this Court is well aware of our nation's situation. *See* General Order regarding The COVID-19 Pandemic filed in this district on December 8, 2020.

---

[13] "WHO Characterizes COVID-19 as a Pandemic," World Health Organization (March 11, 2020), available at https://www.who.int/director-general/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020, last visited December 29, 2020.

[14] The White House Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak (March 13, 2020), available at https://www.whitehouse.gov/presidential-actions/proclamation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak/, last visited December 29, 2020.

[15] *See* https://www.nytimes.com/interactive/2020/world/coronavirus-maps.html, last visited December 28, 2020.

[16] *See* https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html, last visited December 28, 2020.

[17] https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html, last visited December 29, 2020.

At the same time, public health experts have warned that incarcerated individuals "are at special risk of infection" and are "less able to participate in proactive measures to keep themselves safe."[18] Indeed, the conditions in BOP facilities provide a uniquely hospitable environment for COVID-19 to spread.[19] Prior to March 13, 2020, when the BOP suspended visits for 30 days, inmates regularly engaged in social, legal and medical visits with people in the community at a time when the novel coronavirus already began to spread.[20] Even under the present state of lockdown, inmates at FCI Ashland live in shared housing area and are consistently exposed to the indoor air and surfaces used by other inmates and staff.

Just last month, the New York Times editorial board succinctly described the plight faced by prison inmates like Pat Carlineo as follows: "[t]he American penal system is a perfect breeding ground for the virus. Squabbles over mask wearing and social distancing are essentially moot inside overcrowded facilities, many of them old and poorly ventilated, with tight quarters and with hygiene standards that are

---

[18]"Achieving a Fair and Effective COVID-19 Response:  An Open Letter to Vice-President Mike Pence, and Other Federal, State, and Local Leaders from Public Health and Legal Experts in the United States" (March 2, 2020), available at https://law.yale.edu/sites/default/files/area/center/ghjp/documents/final_covid-19_letter_from_public_health_and_legal_experts.pdf (accessed 11/24/20).

[19]Joseph A. Bick, *Infection Control in Jails and Prisons,* CLINICAL INFECTIOUS DISEASES 45(8): 1047-1055 (2007), available at https://academic.oup.com/cid/article/45/8/1047/344842  (accessed 11/24/20); *see also* Keegan Hamilton, *Sick Staff, Inmate Transfers, and No Tests: How the U.S. is Failing Federal Inmates as Coronavirus Hits*, VICE (3/24/20), available at https://www.vice.com/en_us/article/jge4vg/sick-staff-inmate-transfers-and-no-tests-how-the-us-is-failing-federal-inmates-as-coronavirus-hits (accessed 11/24/20).

[20]"Federal Bureau of Prisons Covid-19 Action Plan," available at https://www.bop.gov/resources/news/20200313_covid-19.jsp (accessed 11/24/20).

difficult to maintain."[21] The rate of infection among inmates is more than quadruple the rate of infection of the general public and the death rate more than double.[22] Not only do these grave rates of infection and death impact inmates, they impact those who work within the correctional system such as guards, chaplains and nurses whose rate of infection is triple that of the general public.[23]

Paradoxically, the more the BOP attempts to adhere to appropriate hygiene protocols to reduce the rate of infection, the harsher the experience of incarceration. For example, visitation has been suspended since the outset of the pandemic approximately 9 months ago and has remained suspended for the duration of Mr. Carlineo's incarceration. Inmates' access to commissary, programming, and recreational activities has also been severely restricted, exacerbating the experience of isolation inherent in incarceration and severely impeding the goal of rehabilitation. This experience has been particularly stressful for Mr. Carlineo who, in addition to his underlying medical conditions and his continued suffering from symptoms of COVID-19, also suffers from depression, PTSD, and panic disorder.[24]

As of December 28, 2020, the BOP reported 7,583 federal inmates have current, confirmed positive test results for COVID-19 nationwide, with another 30,152 inmates "recovered," for a total of 37,735 individuals who have been infected

---

[21] *See*, The New York Times Editorial Board, *America is Letting the Coronavirus Rage Through Prisons* (11/21/20), available at
https://www.nytimes.com/2020/11/21/opinion/sunday/coronavirus-prisons-jails.html?referringSource=articleShare.

[22] *Id.*, see also National Commission on COVID-19 and Criminal Justice, "COVID-19 in U.S. State and Federal Prisons," Council on Criminal Justice (September 2020), available at
https://cdn.ymaws.com/counciloncj.org/resource/resmgr/covid_commission/FINAL_Schnepel_Design.pdf.

[23] *Supra* note 21.

[24] *Supra* at p. 5.

with COVID-19 while in BOP custody. This number has increased by 1,632 people *in just the past few days*.[25] In addition, 1,659 BOP staff have confirmed positive test results for COVID-19, while 2797 staff are considered to have recovered (for a total of 4456). There have been 175 federal inmate deaths and 2 BOP staff member deaths attributed to COVID-19 disease as of December 28, 2020.[26] *Three of these 175 inmates died in just the last five days*.[27]

These numbers stand in sharp relief when compared to the same information at the beginning of October. On October 6, 2020, the BOP reported 1568 federal inmates actively infected with 13,544 inmates recovered for a total of 15,112 inmates who had contracted COVID-19. At that time there were 125 federal inmate deaths and 2 BOP staff member deaths attributed to COVID-19 disease.[28]  In less than three months, the number of inmates who had tested positive for COVID-19 more than doubled (from 15,112 to 37,735) *and another 50 people in the custody and care of the BOP have died.*

These numbers are surely under-inclusive given the extremely limited amount of testing within the BOP. Mr. Carlineo advises that the facility is currently testing only symptomatic inmates and is not re-testing individuals, like him, who have previously tested positive. This testing protocol means that potentially

---

[25] The numbers on the BOP.gov website on December 23, 2020 for infected inmates were as follows: 6,537 active cases and 29,566 "recovered," for a total of 36,103.

[26] *See* BOP COVID-19 Cases, available at https://www.bop.gov/coronavirus/, last visited December 28, 2020.

[27] On December 23, 2020, the BOP.gov website reported that a total of 172 inmates had died from COVID-19.

[28] See FPD NY COVID-19 Charts and Graphs, available at https://federaldefendersny.org/assets/uploads/BOP_COVID-19_Charts_and_Graphs.10.6.2020.pdf, last visited December 28, 2020.

positive, but asymptomatic inmates remain in general populations and cases that are considered "resolved" and returned to general population are not actually confirmed to be non-infectious. Indeed, Mr. Carlineo recently observed inmates who had previously tested positive be released from quarantine only to become symptomatic again in general population and returned to the COVID-19 unit.

Moreover, according to the BOP, its report of positive inmates and staff is based on "confirmed lab results involving open cases," which it does not define.[29] Every day we watch as the U.S. experiences yet another record breaking day in COVID-19 deaths and cases; one can only imagine the consequences within the BOP with a rate of infection that far outpaces that within the outside community.

### B. Patrick Carlineo's obesity, asthma, and other significant medical conditions place him in the high risk category for suffering serious complications from COVID-19.

As noted above, Mr. Carlineo's medical records from the BOP, in addition to his previous medical history, reveal that his chronic medical conditions include asthma; sleep apnea; and atrial fibrillation. With a BMI of 35.5, he is well above the point at which one is considered to be obese.[30]

Patrick Carlineo is among those at highest risk of serious symptoms and death as a result of his exposure to COVID-19 because he suffers from obesity. His medical records (attached as Exhibit A) reveal that his most current height is 5'6' and his weight is 218; the PSR (Doc. 43) reflects nearly the identical measurements. A study from the Centers for Disease Control and Prevention concludes that

---

[29] https://www.bop.gov/coronavirus/, last visited on December 28, 2020.
[30] https://www.cdc.gov/healthyweight/assessing/bmi/adult_bmi/english_bmi_calculator/bmi_calculator.html, last visited December 28, 2020.

obesity, defined as a BMI between 30 and 40, is one of the most commonly reported underlying medical conditions in COVID-19 patients who require hospitalization; in patients from 18 to 64 years of age (Mr. Carlineo is 57) it is the most common underlying condition. *See Exhibit C*, CDC "Morbidity and Mortality Weekly Report (MMWR), April 17, 2020, Vol. 69, No. 15 at p. 459. As noted above, Mr. Carlineo's BMI is 35.5.

Previously, the CDC identified those with a BMI of 30 or above as being at high risk for serious symptoms or death in connection with COVID-19; based on revisions made on October 6, 2020, the CDC has expanded its definition of those at increased risk due to weight to include not only those who are obese like Patrick Carlineo, but even those who are merely overweight with a BMI of 25 to 30.[31] In recognition of the COVID-19 dangers associated with obese inmates, in *United States v. Steven Cole*, ELH-18-167 (D. Md.), the United States Attorney for the District of Maryland recently conceded that a BMI above 30 constitutes an extraordinary and compelling reason warranting a reduction in sentence:

> The Government last night received guidance from the Department of Justice interpreting the updated CDC guidance of June 25, 2020. This CDC guidance broadened the definition of some of the conditions that CDC states are risk factors, including obesity. The Department continues to follow the CDC's guidance in determining whether an "extraordinary and compelling reason" exists.

*See* Exhibit D.

---

[31] *See* Coronavirus Disease 2019 (COVID-19) People with Certain Medical Conditions (11/2/20), Centers for Disease Control and Prevention, available at https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (accessed 11/24/20).

Courts are increasingly heeding the call from legal and medical experts by releasing vulnerable inmates from overcrowded facilities to alleviate the suffering caused by exposure to COVID-19. Among them, courts have also recognized that inmates suffering from obesity, like Patrick Carlineo, are at high risk and, therefore, are deserving of compassionate release.[32] As noted above, even the government is now conceding in out-of-district cases that obesity is an "extraordinary and compelling" reason permitting compassionate release.[33] "On May 18, 2020, the Department of Justice issued internal guidance that directed the government to concede that a defendant who presents any of the CDC high-risk factors can establish "extraordinary and compelling reasons." *United States v. Rodriguez*, 17-cr-4477 (S.D. Ca. 7/9/20).[34] Based on his obesity alone, therefore,

---

[32] *See, e.g., United States v. Tamasoa*, No. 15-cr-0124 (E.D. Ca. 11/13/20); *United States v. Smith*, No. 15-cr-6-001 (W.D. Va. 7/23/20); *United States v. Black*, No. 11-cr-83 (8/10/20); *United States v. Curington*, No. 12-20015-cr (S.D. Fl. 7/6/20); *United States v. Burnside*, No. 18-cr-2068 (E.D. Iowa 6/18/20); *see, e.g., United States v. Handy*, 3:10-cr-00128-RNC-8, 2020 WL 2487371 (D. Conn. May 14, 2020); *United States v. Barber*, 6:18-cr-00446-AA, 2020 WL 2404679 (D. Or. May 12, 2020); *United States v. Hunt*, 2:18-cr-20037-DPH-DRG, 2020 WL 2395222 (E.D. Mich. May 12, 2020); *United States v. Ullings*, 1:10-cr-00406-MLB-1, 2020 WL 2394096 (N.D. Ga. May 12, 2020); *United States v. Foreman*, 3:19-cr-00062-VAB-1, 2020 WL 2315908 (D. Conn. May 11, 2020); *United States v. Jenkins*, 99-cr-00439-JLK-1, 2020 WL 2466911 (D. Co. May 8, 2020); United States v. Quintero, 6:08-cr-06007-DGL-1, 2020 WL 2175171 (W.D. N.Y. May 6, 2020); *United States v. Howard*, 4:15-cr-00018-BR-2, 2020 WL 2200855 (E.D. N.C. May 6, 2020); *United States v. Lacy*, 3:15-cr-30038-SEM-TSH-1, 2020 WL 2093363 (C.D. Ill. May 1, 2020); *United States v. Ardila*, 3:03-cr-00264-SRU-1, 2020 WL 2097736 (D. Conn. May 1, 2020); *United States v. Delgado*, 3:18-cr-00017-VAB, 2020 WL 2464685 (D. Conn. Apr. 30, 2020); *United States v. Dillard*, 1:15-cr-170-SAB, Dkt. No. 71 (D. Idaho Apr. 27, 2020); *United States v. Joling*, 6:15-cr-00113-AA-1, 2020 WL 1903280 (D. Or. Apr. 17, 2020); *United States v. Trent*, 3:16-cr-00178-CRB-1, 2020 WL 1812242 (N.D. Cal. Apr. 9, 2020); *United States v. Zukerman*, 1:16-cr-00194-AT-1, 2020 WL 1659880 (S.D. N.Y. Apr. 3, 2020).

[33] *See United States v. Steven Cole, supra; see also United States v. Tranese*, 17-cr-559 (E.D.N.Y. 8/7/20), Doc. 103 (Government letter memorandum); *see also United States v. Davis*, 13-cr-45 (S.D.In.8/7/20) (Order).

[34] *See also United States v. Firebaugh*, Case No. 1:16CR20341-CR-UU, Dkt. No. 43 (S.D. Fla. June 1, 2020); *see also Wise v. United States*, No. CR ELH-18-72, 2020 WL

Patrick Carlineo has established "extraordinary and compelling" reasons to grant him compassionate release by sentencing him to time served to be followed by home confinement.

Similarly, because COVID-19 primarily targets the lungs, moderate to severe asthma has been consistently recognized as an underlying medical condition that may increase an individual's risk of developing severe illness from the virus that causes COVID-19.[35] As a result, numerous courts have granted motions for compassionate release even when (unlike Mr. Carlineo) asthma is the *only* risk factor increasing an inmate's vulnerability to the most serious effects of COVID-19 infection.[36]

---

2614816, at *7 (D. Md. May 22, 2020) ("[J]ust last week, the Department of Justice adopted the position that any inmate who suffers from the chronic conditions associated with severe illness from COVID-19 are eligible for compassionate release.").

[35] https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html#asthma, last accessed December 28, 2020.

[36] *See, e.g.*, *United States v. Gorai*, 2020 WL 1975372, at *3 (D.Nev., Apr. 24, 2020) (granting motion for reduction after finding "defendant's asthma falls squarely within the ambit of preexisting conditions that the CDC has unambiguously explained place him at greater risk of COVID-19"); *United States v. Norris*, No. 3:18-cr-243, No. 37 (D. Conn., Apr. 16, 2020) (granting reduction where only risk factor identified was asthma: "[Defendant] suffers from asthma and uses an Albuterol inhaler to treat his symptoms. . . . [H]is medical condition and current conditions of confinement constitute extraordinary and compelling reasons to reduce his sentence."); *United States v. Wen*, 2020 WL 1845104 (W.D.N.Y., Apr. 13, 2020) (granting reduction for 48-year old defendant where only risk factor was history of asthma; noting *possible* positive case at institution); *United States v. Tran*, 2020 WL 1820520 (C.D. Cal., Apr. 10, 2020) (granting reduction for defendant serving a 15 year sentence for Hobbs Act robbery and possession of a machine gun where defendant suffered from asthma since childhood and was housed in a facility with an active COVID-19 outbreak); *United States v. Hernandez*, ___ F.Supp.3d ___, 2020 WL 1684062, at *3 (S.D.N.Y., Apr. 2, 2020) (granting reduction based on CDC guidance that persons with asthma are at high risk of serious illness if they contract the disease); *United States v. Gentille*, 2020 WL 1814158 (S.D.N.Y., Apr. 9, 2020) (same); *United States v. Lee*, ___ F.Supp.3d. ___, 2020 WL 2512415 2 (N.D.Cal., 2020) (granting reduction; noting the government did not dispute that moderate to severe asthma is a recognized risk factor); *United States v. Echevarria*, 2020 WL 2113604 (D.Conn., May 4, 2020) (granting reduction for 49-year old with history of asthma, though court noted other unidentified "chronic

In addition to asthma and obesity, Mr. Carlineo also suffers from sleep apnea and atrial fibrillation, both of which may also complicate the treatment of COVID-19 and increase the likelihood of a negative outcome as a result of the disease.[37] Indeed atrial fibrillation is among the "top 10 comorbidities" for COVID-19 fatalities tracked by the New York State Department of Health.[38] Many courts have also included these underlying conditions in support of finding that an inmate has established "extraordinary and compelling" reasons for granting relief.[39]

Mr. Carlineo's medical conditions, which place him at increased risk of severe illness and devastating results of potential re-infection, the surging rate of infection in the country and BOP facilities in particular (including in residential re-entry

---

medical problems"). Sometimes courts cite asthma and other respiratory issues (like chronic bronchitis). *See, e.g., United States v. McCarthy*, 2020 WL 1698732, at *1 (D.Conn., 2020) (granting reduction for armed bank robber with COPD, asthma and other lung related ailments);  *United States v. Gileno*, 2020 WL 1916773, at *5 (D.Conn., Apr 20, 2020) (granting where defendant suffers from "chronic asthma and other respiratory issues that put him at increased risk").

[37] *See* Gawałko M, Kapłon-Cieślicka A, Hohl M, Dobrev D, Linz D. COVID-19 associated atrial fibrillation: Incidence, putative mechanisms and potential clinical implications. Int J Cardiol Heart Vasc. 2020 Oct; 30:100631, available at https://pubmed.ncbi.nlm.nih.gov/32904969/, last visited December 28, 2020.

[38] *See* https://covid19tracker.health.ny.gov/views/NYS-COVID19-Tracker/NYSDOHCOVID-19Tracker-Fatalities?%3Aembed=yes&%3Atoolbar=no&%3Atabs=n, last viewed December 28, 2020.

[39] *See United States v. Hunt*, No. 2:18-cr-20037-DPH-DRG, 2020 WL 2395222 (E.D. Mich. May 12, 2020); *United States v. Amarrah*, 458 F.Supp. 3d 611, 2020 WL 2220008 (E.D. Mich. May 7, 2020); *United States v. Saad*, 2020 U.S. Dist. LEXIS 74949 E.D. Mich. April 29, 2020; United States v. Delgado, No. 3:18-cr-00017-VAB, 2020 WL 2464685 (D. Conn. Apr. 30, 2020); United States v. Brown, No. 4:05-cr-00227-RP-CFB-1, 2020 WL 2091802 (S.D. Iowa Apr. 29, 2020); United States v. Saad, No. 16-20197, 2020 WL 2251808 (E.D. Mich. May 5, 2020); United States v. Harper, No. 7:18-cr-00025-EKD-JCH-1, 2020 WL 2046381 (W.D. Va. Apr. 28, 2020); United States v. Scparta, No. 1:18-cr-00578-AJN-1, 2020 WL 1910481 (S.D.N.Y. Apr. 20, 2020); United States v. Gross, No. 1:15-cr-00769-AJN-3, 2020 WL 1673244 (S. D.N.Y. Apr. 6, 2020); United States v. Powell, No. 1:94-cr-316-ESH, 2020 WL 1698194 (D.D.C. Mar. 28, 2020)

centers), constitute extraordinary and compelling reasons justifying a reduction of

his sentence to time served to allow him to complete the remainder of his sentence

under home confinement, rather than at the RRC as currently scheduled.

### C.   Mr. Carlineo's Request for Immediate Release to Home Confinement is no Less Compelling Because He Has Already Contracted the Coronavirus.

#### 1.   Symptoms of COVID-19 may linger and cause permanent damage

Between May and December of 2020, Mr. Carlineo was exposed to other

inmates and/or staff at FCI Ashland who had already contracted COVID-19. In

December of 2020, he tested positive for COVID-19. Mr. Carlineo now faces an

uncertain future based on the long-term physical effects and potential disabilities

that may follow from becoming sick with COVID-19. This is particularly true in the

context of his existing, serious medical conditions (including Obesity, Asthma,

Atrial Fibrillation, and Sleep Apnea). As noted above, Mr. Carlineo's medical

records appear to indicate that, as of December 14, 2020, his COVID-19 infection is

"resolved." It is unclear, however, what this term means in this context.[40]

Specifically, on the same date this note appears in his record, Mr. Carlineo was

apparently seen (or a request made) because he was complaining of symptoms of the

virus. Moreover, he continues to experience lingering effects of his COVID-19

infection, including fatigue and headaches. Finally, because Mr. Carlineo has not

---

[40] Indeed, it could well be that this term is meant only to indicate that the reason for the entry, i.e., his request for Tylenol, has been "resolved." Anecdotally, in another case handled by this office, a BOP inmate's blindness was also characterized as "resolved" despite his ongoing lack of sight.

been re-tested for the presence of the virus, it's not clear that any medical determination has been made that he has "recovered" from it.

Moreover, a COVID-19 infection is not like having the common cold; its effects can linger for weeks, months, or potentially a lifetime.[41] Indeed, the symptoms Mr. Carlineo continues to experience (i.e. fatigue and headache) are among the most common lingering effects of COVID-19 infection.[42] While these lingering symptoms are more frequent in older people and those with underlying conditions, even young and otherwise healthy individuals "can feel unwell for weeks to months after infection."[43]

### 2. Mr. Carlineo faces the continuing threat of reinfection

Aside from the sequelae of the initial infection, Mr. Carlineo faces a continuing risk from a new COVID-19 infection. As noted by the World Health Organization, "There is currently no evidence that people who have recovered from COVID-19 and have antibodies are protected from a second infection."[44] Dr. Bill Moss, professor and executive director of the International Vaccine Access Center at the Johns Hopkins Bloomberg School of Public Health, explained as follows:

**Once someone recovers from a novel coronavirus infection, are they then immune from the virus?**

---

[41] *See* https://www.cdc.gov/coronavirus/2019-ncov/long-term-effects.html, last visited 12/28/20 ("As the pandemic unfolds, we are learning that many organs besides the lungs are affected by COVID-19 and there are many ways the infection can affect someone's health"); *see also https://www.mayoclinic.org/diseases-conditions/coronavirus/in-depth/coronavirus-long-term-effects/art-20490351*, last visited 12/28/20 (noting that the initial symptoms of COVID-19 can last for months, followed by lasting damage to organs including the heart, lungs, and brain).

[42] *Id.*

[43] *Id.*

[44] https://www.who.int/news-room/commentaries/detail/immunity-passports-in-the-context-of-covid-19, last visited 12/28/20.

Yes, on some level—and that's the key question: how strong is the immunity and how long does it last? Right now, we don't know. We do have some evidence that recovered patients will be immune; we just don't know for how long…

Another consideration is that people who have a mild or asymptomatic infection could also have a lower immunity level. There's already some evidence for this idea. We also know that in animal and monkey models, a certain level and type of antibody response correlates with immunity and protection – so a more severe infection might lead to a higher immunity level. We haven't proven it yet, but we have a good idea based on our knowledge of how other viral infections work. For other coronaviruses, we do know immunity doesn't last very long, maybe on the order of months to years.

**Do people who have recovered from a COVID-19 infection still need to maintain public health measures like staying home, keeping six feet apart, washing their hands, and wearing masks?**

Yes, absolutely. The biggest reason is because, to answer this question definitively, we need to know the duration of a person's protective immunity from COVID-19. Essentially, after someone has recovered, can they get re-infected and, if so, are they potentially contagious to other people? Right now, the presumptive answer is probably not, but until we can say for sure we all need to follow the public health guidelines.

The other part of this question we need to answer is: are people who have recovered fully protected, or are they susceptible to reinfection? Until we really know for sure, it's probably safest for those individuals to maintain measures like physical distancing and wearing masks.[45]

Given the danger of reinfection for those who have previously contracted

COVID-19, and the fact that the virus spreads rapidly and indiscriminately in

environments where individuals are housed in dense groups, Mr. Carlineo remains

at high risk of falling ill again if he remains in BOP custody, either at FCI Ashland

or at a halfway house.

**3.      There is ample precedent for granting compassionate release to inmates who have already tested positive for COVID-19**

---

[45] https://coronavirus.jhu.edu/from-our-experts/can-i-get-it-twice-herd-immunity-vaccines-and-covid-19-a-q-and-a-with-dr-bill-moss, last visited December 28, 2020.

In light of Mr. Carlineo's underlying medical issues and the conditions under which he is incarcerated at FCI Ashland, his having been previously infected with COVID-19 should not dissuade the Court from granting him compassionate release. Indeed, District Courts throughout the country have granted compassionate release under similar circumstances, as set forth below:

*Erick Pizarro,* Case No. 15-cr-00172-LJV-HBS (W.D.N.Y. December 28, 2020) (granting motion for compassionate release modifying inmate's sentence by converting the remaining term of imprisonment to a term of supervised release, despite defendant's previous infection with COVID-19 while incarcerated.)

*United States v. Huerte*, Case No. 11-cr-20587-SCOLA, DE 1584 at 2-3 (S.D. Fla. July 31, 2020) (granting compassionate release to a defendant who was obese and suffered from an upper respiratory infection, even though her COVID-19 illness had not required hospitalization, and even though she now tested negative, because of the possibility that she could "still develop complications from the disease, and crucially [] was still susceptible to catching COVID-19 a second time;" finding that "regardless of whether or not Huerte currently has COVID-19 19, the compassionate release analysis is the same because of the risk of death from COVID-19 given defendant's underlying conditions, and the "danger of contracting the disease again");

*United States  v. Vazquez Torres*, Case No. 19-cr-20342- BLOOM, DE 58 at **6-7 (S.D. Fla. July 10, 2020) (granting compassionate release to a defendant with several underlying medical issues including hypertension who had contracted COVID-19 due to "BOP's apparent inability to adequately treat Defendant's COVID-19 infection;"  finding that release would "allow[] him to seek medical care and treatment by providers who are familiar with his medical issues and equipped to treat him");

*United States v. Israel,* Case No. 95-cr-314-LEONARD, DE 451, 452, 463 (S.D. Fla. July 29, 2020) (granting compassionate release to an elderly defendant who – like Mr. Desoto – contracted COVID-19 at FCI Miami, was placed in isolation there, and even though the government claimed he had "a fairly mild case" because he reported "no fatigue, pain, shortness of breath, cough, fever, or labored respiration," he nonetheless thereafter developed COVID-19 -related pneumonia; government had  conceded that despite defendant's "mild case," the "after effects of a COVID-19 infection can include significant detrimental effects on the heart and lungs; finding extraordinary and compelling reasons for his release based on defendant's advanced age and current health ailments including COVID-19 );

*United States v. Watson*, Case No. 3:18-cr-00025-MMD-CLB, DE 51 (D. Nev. July 22, 2020) (granting compassionate release to defendant at Terminal Island who was asymptomatic when he tested positive for COVID-19 , because defendant's medical conditions "put him at higher risks should he become reinfected");

*United States v. Armstrong*, Case No. 18-cr-5108, DE 45 at 6 (S.D. Cal. July 30, 2020) (granting release to an inmate who the BOP had pronounced "recovered," because another inmate at the same facility, Terminal Island, "was hospitalized and died . . . after the BOP had shown him recovered;" [A]nnouncing that an inmate has 'recovered' does not mean that Mr. Armstrong is completely safe");

*United States v. Martin*, ___ F. Supp.3d ___, 2020 WL 4555796, at *4 (W.D.Wash. Aug. 3, 2020) (releasing defendant at FCI Terminal Island; rejecting government's claim that defendant had "recovered" and was "at reduced risk for reinfection;" noting the "scientific uncertainties surrounding recovery from the virus, including whether those who have recovered from COVID-19 may be susceptible to reinfection");

*United States v. Davidson*, 2020 WL 4877255, at *20 (W.D. Pa. Aug.20, 2020) (releasing defendant who had tested positive for COVID-19 , was largely asymptomatic, and appeared to "recover," because it was unclear whether "his 'recovered status ensures that he is not currently suffering from lingering or latent effects caused by contraction of the virus (even if unbeknownst to him at this time), or that his long-term health has not been negatively impacted;" finding that the defendant's several pre-existing medical conditions, "viewed in light of the COVID-19  pandemic," were "extraordinary and compelling" for purposes of compassionate release; noting also that the risk of reinfection might also be somewhat higher for those who have tested positive but were largely asymptomatic);

*United States v. Williams*, No. 5:16-cr-386, DE 87 (N.D. Ohio Sept. 2, 2020) (releasing defendant who "has already contracted COVID-19 once" noting "the CDC does not know if someone can be re-infected with COVID-19"); *United States v. Reynolds*, No. 2:18-cr-131, 2020 WL 5015294, at *2 (W.D. Wash. July 23, 2020) (releasing defendant who previously tested positive and noting "it is also a matter of record that the CDC's guidance indicates that it does not know whether people who recover from COVID-19 can become infected again"); *United States v. Sperry*, No. 2:18-cr-121, DE 58 (W.D. Pa. Sept. 10, 2020) (noting defendant tested positive in May and that "[r]isks of re-infection are not yet understood");

*United States v. Yellin*, No. 3:15-CR-3181-BTM-1, 2020 WL 3488738, at *3 (S.D. Cal. June 26, 2020) (granting compassionate release to a defendant who tested positive after several court hearings and did not develop severe symptoms because "the possibility of reinfection persists" and citing the death of Adrian Solarazano as "an example of at least one inmate dying from COVID-19 after Terminal Island deemed him recovered from the virus");

*United States v. Schaffer*, 13-cr-00220-MMC, ECF 40 (N.D Cal. June 24, 2020) (granting compassionate release to a defendant who recovered from COVID-19, noting "the scientific community has not, as of this date, determined whether a prior infection produces immunity or affects the severity of any potential subsequent infection"); *United States v. Common*, No. 17-cr-30067, 2020 WL 3412233 (C.D. Ill. June 22, 2020) (granting compassionate release to a defendant who already had COVID-19, highlighting that the World Health Organization warned that "the public belief that a one-time infection leads to immunity remains unproven and is unreliable as a basis for response to the pandemic");

*United States v. Halliburton*, No. 17-CR-20028, 2020 WL 3100089 (C.D. Ill. June 11, 2020) (granting compassionate release to a 42-year-old defendant with asthma, obesity, and COVID-19: "based on the currently available scientific data, Defendant continues to be at risk of imminent harm based on his underlying medical conditions"); *United States v. Williams*, No. PWG-19 -0134, ECF No. 70 at 7 (D. Md. June 10, 2020) (granting compassionate release to a defendant with obesity and who appeared to be recovered from COVID-19 and had been released back into the general inmate population.);

*United States v. Snell,* No. CR 16-20222-6, 2020 WL 2850038 (E.D. Mich. June 2, 2020) (granting compassionate release to a defendant who tested COVID-19 positive in April because of the ongoing strain on his access to medical care); *United States v. Arreola-Bretado,* 3:19-cr-3410, ECF 50 (S.D. Cal. May 15, 2020) (granting compassionate release to defendant who tested positive for COVID-19 after concluding she will receive superior medical care outside of the custody of the Otay Mesa detention facility); See, e.g., *United States  v. Vazquez Torres*, Case No. 19-cr-20342- BLOOM, DE 58 at **6-7 (S.D. Fla. July 10, 2020) (granting compassionate release to a defendant with several underlying medical issues including hypertension who had contracted COVID-19 due to "BOP's apparent inability to adequately treat Defendant's COVID-19 infection;" finding that release would "allow[] him to seek medical care and treatment by providers who are familiar with his medical issues and equipped to treat him").

Similarly, Mr. Carlineo's request is not diminished by his previous, and continuing infection with COVID-19.

## D.      Review of the § 3553(a) factors supports Mr. Carlineo's release.

Under the compassionate release statute, when a defendant establishes the existence of extraordinary and compelling circumstances justifying relief, courts must consider the sentencing factors of 18 U.S.C. § 3553(a) to determine whether a sentencing reduction or modification is warranted.  18 U.S.C. § 3582(c)(1)(A)(i).

Here, Mr. Carlineo's compromised physical and mental health; the unique danger
he faces of becoming seriously ill and/or re-infected with COVID-19; and the
unusually harsh and isolated conditions under which he has been incarcerated,
when considered in combination with the § 3553(a) factors, supports his request for
reduction of his sentence to time served to be followed by home confinement.

Even without a reduction of his sentence as a result of these extremely
unique circumstances, Mr. Carlineo would be released from Ashland FCI to the
Volunteers of America RRC in one month's time, on January 29, 2021. He has
already served the majority of his one year plus one day sentence. Moreover, service
of the Court's sentence has been atypically harsh as a result of the pandemic. From
the time Mr. Carlineo arrived in May, Ashland FCI has been in partial or full
lockdown. All social visits have been suspended during the entire period of his
incarceration. Inmate movement has been dramatically decreased, and
programming virtually non-existent. As reflected in the outside community as well,
soon after restrictions began to ease, the "lock-down" was re-imposed as the virus
began to surge this fall. To the extent imprisonment is designed not only to punish,
but to rehabilitate, the restrictions required to mitigate the spread of the virus have
made that all but impossible.

Similarly atypical restrictions also exist at the RRC, where Mr. Carlineo is
scheduled to reside beginning on January 29, 2021. The stated goal of the RRC is to
"help adults transition from incarceration and get a fresh start. The services we
provide include: housing, specialized case management, employment assistance,

and life skills training to help people develop positive self-reliant lives.[46] The availability and effectiveness of these resources, however, are undoubtedly affected by pandemic-related restrictions. Moreover, for the most part, Mr. Carlineo is not in need of these services. He has stable and appropriate housing where he has resided for years; he is permanently disabled from obtaining employment; and his life skills are not only adequate, but desperately needed at his home. Thus, while these services are no doubt valuable to many formerly incarcerated individuals adjusting to life in the community, their availability is currently curtailed by the ongoing pandemic, which is particularly acute in Monroe County, and ultimately not appropriate to Mr. Carlineo's individual circumstances.

Being physically separated from family, friends, and the usual amenities of life outside prison is an inevitable consequence of imprisonment. Being held under the current restrictions and exposed to a potentially deadly virus, however, is a far harsher sentence than anticipated at the time of sentencing. The stress of living in close quarters during this pandemic is also exacerbated for Mr. Carlineo who suffers from depression, PTSD, and panic disorder. The severity of the conditions of confinement have intensified Mr. Carlineo's prison term and, even if reduced, this sentence amply addresses the serious nature of the offense.

Mr. Carlineo's history and characteristic support this request. As noted extensively in the sentencing statement submitted on Mr. Carlineo's behalf, for years before he committed the instant offense, and while at liberty while this case was pending, Patrick Carlineo led a quiet, productive life. Mr. Carlineo was a

---

[46] *See* https://www.voaupny.org/reentry, last visited December 29, 2020.

devoted father, grandfather, and fiancé who, though permanently disabled, was a productive member of society. He cared for his grandson during the day, managed the household (providing food and shelter for his family), and spent time performing as a musician, frequently for charitable causes. Despite the threatening nature of the language he used in his phone call to Congresswoman Omar's office, the government conceded (and probation agreed) that there was no evidence that Mr. Carlineo had any plan or intention of causing her harm.

Mr. Carlineo is not a danger to his community. During the seven months of his incarceration, he has been a model inmate, despite the lack of activities and inability to see his family. Reducing Mr. Carlineo's sentence now, when he has already been scheduled to be released from prison, does not undermine the Court's original determination. The landscape of the entire world has changed and consideration of the § 3553(a) factors anew, in light of COVID-19 and the significant risk to Mr. Carlineo, and to others with whom he would share living space at the RRC, supports his request for a sentence reduction to time served, followed by immediate release to home confinement.

### E.     This Court Has Jurisdiction Over Mr. Carlineo's Motion

This court has jurisdiction to adjudicate Mr. Carlineo's motion, despite the pendency of a limited appeal. On March 18, 2020, Mr. Carlineo filed a Notice of Appeal to the Second Circuit (Dkt. 51), and subsequently filed a brief challenging one, specific special condition of supervision. *See United States v. Patrick W. Carlineo*, Case 20-1020, Doc. 20, filed 07/20/20. Mr. Carlineo is challenging only that special condition of supervision; he is not challenging the length of his sentence as part of his appeal.

28

The filing of the notice of appeal "divests the district court of its control over those aspects of the case involved in the appeal." *Griggs v. Provident Consumer Disc. Co.*, 459 U.S. 56, 58 (1982). Because the instant motion does not affect any aspect of the case that is currently before the Second Circuit Court of Appeals, this Court has jurisdiction to rule on this matter. In *Ching v. United States*, 298 F.3d 174, 180 n.5 (2d Cir. 2002), the Second Circuit reiterated this standard: "The district court could not rule on any motion *affecting an aspect of the case that was before this Court*, including a motion to amend the motion, while that appeal was pending." *Id.* (*emphasis added*.)

Because the length of Mr. Carlineo's incarceration is *not* before the Court of Appeals, and its decision will have no impact on the instant request, this Court has jurisdiction to issue a ruling on Mr. Carlineo's application for Compassionate Release. Should the Court find that it lacks jurisdiction, Mr. Carlineo respectfully requests the Court to issue an indicative ruling setting forth the Court's position regarding the issues raised in the instant motion.

## IV.   <u>CONCLUSION</u>

For all of these reasons, the defense respectfully requests that the Court grant this motion for compassionate release and reduce Mr. Carlineo's prison sentence to time served and order his immediate release to home confinement for the remainder of his sentence.

**DATED**:      December 28, 2020
           Rochester, New York

                          Respectfully submitted,

                          **/s/ Sonya A. Zoghlin**

Assistant Federal Public Defender
Federal Public Defender's Office
28 E. Main Street, Suite 400
Rochester, New York 14614
(585) 263-2601; FAX: 585-263-5871
sonya_zoghlin@fd.org

**TO:**   Brett Harvey
          Assistant United States Attorney